# EXHIBIT "I"

```
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK




------------------------------X
                              :
LARA CURTO,                   :
                              :    CV-03-6327 (DRH)(MLO)
                Plaintiff.    :
                              :    January 18, 2006
                              :
          V.                  :    Central Islip, NY
                              :
MEDICAL WORLD COMMUNICATIONS,:
INC., et al.,                 :
                Defendants.   :
------------------------------X


           TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
           BEFORE THE HONORABLE MICHAEL L. ORENSTEIN
                UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

For the Plaintiff:     LOIS SCHLISSEL, ESQ.
                       ANDREW E. CURTO, ESQ.


For the Defendant:     JOHN P. McENTEE, ESQ.
                       JAMES P. ANELLI, ESQ.
                       ARON M. SCHWARTZ, ESQ.
                       ROGER H. BRITON, ESQ.

Audio Operator:


Court Transcriber:     ARIA TRANSCRIPTIONS
                       c/o Elizabeth Barron
                       328 President Street, #3
                       Brooklyn, New York 11231
                       (718) 522-2335


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
 1              THE CLERK:  Calling CV-03-6327, Curto v. Medical
 2    World Communications, Incorporated.  Please state your
 3    appearances.
 4              MS. SCHLISSEL:  For the plaintiff, Lois Schlissel
 5    of Meyer, Suozzi, English & Klein.
 6              MR. CURTO:  Andrew Curto, Forchelli, Curto,
 7    Schwartz, Mineo, Carlino & Cohn, for plaintiff.
 8              MR. McENTEE:  For Medical World Communications and
 9    company defendants, Farrell Fritz by John McEntee.
10              MR. ANELLI:  For the corporate defendants and Mr.
11    Hennessy and Mr. Issler, James Anelli of St. John & Wayne.
12              MR. SCHWARTZ:  Aron Schwartz for defendants King
13    and Perkins.
14              MR. BRITON:  Roger Briton, Jackson Lewis, LLP, for
15    defendant James Granato.
16              THE COURT:  I'm sorry, James who?
17              MR. BRITON:  Granato, G-r-a-n-a-t-o.
18              THE COURT:  Okay, thank you.  Please be seated.
19              Were the depositions held with regard to the
20    enforcement of the corporate computer policy?
21              MS. SCHLISSEL:  We've taken four depositions, your
22    Honor.  We have noticed an additional two, but we're
23    prepared to report back to you with the rather significant
24    information we obtained in four depositions.
25              THE COURT:  Are there transcripts available of
```

1   those yet?

2           MS. SCHLISSEL:  Yes, all but one.  The last

3   session we don't have.  And we have excerpts to hand up to

4   you.

5           THE COURT:  Essentially, what do those depositions

6   reflect?

7           MS. SCHLISSEL:  May I, your Honor?

8           THE COURT:  Sure.

9           MS. SCHLISSEL:  Your Honor, when we left off here,

10  we left off with the recognition that the fact that MWC,

11  Medical World has a policy is not the end of the story.  We

12  have to take a look at whether or not that policy was

13  enforced, how it was --

14          THE COURT:  Well, I added that factor.  If I had

15  followed the case law throughout the United States, nobody

16  had ever asked about that before.  I haven't seen one case

17  which raised that as a factor.

18          MS. SCHLISSEL:  So we looked at those issues.  We

19  looked at implementation, we looked at enforcement.  We

20  looked at whether there was a reasonable expectation of

21  confidentiality.

22          We deposed the director of human resources, the

23  director of IT, the HR manager and the senior IT

24  administrator.  Frankly, most of that was done in January,

25  because even though we --

1           THE COURT:  This is still January, isn't it?

2           MS. SCHLISSEL:  Yes.

3           THE COURT:  Okay.

4           MS. SCHLISSEL:  About two weeks ago, I'd say, your

5    Honor, because they were delayed.  But we succeeded and we

6    can report back to you some pretty interesting information.

7    We learned a lot.

8           We looked first at, was the computer usage policy

9    enforced?  The testimony was consistent across the board.

10   The director of IT, whose name is John Ligenzowski --

11          THE COURT:  Do you want to spell that, just so the

12   transcriber of this record can do it?

13          MS. SCHLISSEL:  Yes, actually, I enjoy spelling

14   that; L-i-g-e-n-z-o-w-s-k-i.  He testified at pages 46 to

15   47, and what I'd like to do, your Honor, is hand up a packet

16   of excerpts now, so that when I mention pages, you'd have

17   them.  Would that be permissible?

18          THE COURT:  That would be fine.  Do you have an

19   extra packet?

20          MS. SCHLISSEL:  I have packets for everyone.

21          THE COURT:  Do the defendants have the transcripts

22   or whatever you're going to use to follow along with?

23          MR. McENTEE:  I'm not sure what excerpts they're

24   handing up.  Hopefully, counsel has a copy for us.  Mr.

25   Ligenzowski, head of IT, testified that monitoring was never

1    done.   He was never instructed -- the IT department was

2    never instructed to enforce the policy.  The IT department

3    had no procedures to monitor or inspect computer usage, and

4    no procedures with regard to compliance with Medical World's

5    policy.  That's at pages 44 through 47 of Mr. Ligenzowski's

6    transcript.

7         In fact, he testified, monitoring could not be

8    done.  Why?  Because employee e-mails are not archived or

9    retained.  Once the employee opens the e-mail, it's gone

10   from Medical World's server, so there is nothing to monitor.

11   There's nothing to review.  That's at page 15, line 23 of

12   Mr. Ligenzowski.

13        In fact, he said, I pointed that out to the

14   company, to management, because it's sloppy, it's not good

15   business.  Nevertheless, they didn't change that procedure.

16   They're still not archiving employee e-mails.  When an

17   employee opens up an e-mail, it's gone.

18        THE COURT:  That's not part of this packet, by the

19   way, page 15 of his deposition.  I believe the packet --

20        MS. SCHLISSEL:  Okay, I'll hand that up separately

21   then, your Honor.

22        THE COURT:  -- goes from page 4 to 21, just so you

23   understand that.

24        MS. SCHLISSEL:  Let's move to Mr. Cruz.  Jose

25   Cruz, the senior IT administrator, was asked, did he ever

1    access the computer to see if there were violations --

2              THE COURT:  Do you have a page?

3              MS. SCHLISSEL:  Page 83.  He testified he never --

4    not a few times.  He never accessed a computer to see if

5    there were violations of the policy.

6              Let's move on to the director of human resources,

7    Blanche Marchido (ph), page 201.  She testified, any

8    monitoring, that would have been done by IT, not human

9    resources, and she did not know if IT did monitoring.

10             Interestingly, though, when she was asked, how was

11   this policy implemented, at page 199 to 200, she said, it's

12   in the handbook.  Well, we asked, did you point it out when

13   you hired a new employee?  No, I just gave them the book.

14   It's on page 44 of that 59-page book that was handed over.

15             So given that there was no instruction to

16   employees and no monitoring and no review of usage, we

17   explored the next question, which was, alright, well, were

18   the employees observing the policy anyway?  Were they

19   following it?  Again, the testimony was consistent across

20   the board; the answer was no.

21             Mr. Cruz, at page 87 -- he testified at page 87

22   that all MWC employees used their MWC computers for personal

23   use.  Not some, not most, all.

24             THE COURT:  I'm sorry, page what?

25             MS. SCHLISSEL:  87 of Mr. Cruz, who is the senior

| | |
|---|---|
| 1 | IT administrator.  They all use it for personal purposes. |
| 2 | Management knows it, IT knows it and human resources knows |
| 3 | it.  In fact, the IT and human resources officers that we |
| 4 | deposed testified -- they said that we do the same thing. |
| 5 | For example, Ms. Verboda (ph), the HR manager, |
| 6 | testified at page 177 that she too uses her MWC computer for |
| 7 | personal purposes.  And MWC takes not action to stop that |
| 8 | usage.  There is no procedure to stop it, there's no |
| 9 | enforcement.  That's Mr. Cruz at 82 to 83. |
| 10 | There was a related question we looked at, related |
| 11 | to the personal use.  And the related question was the AOL |
| 12 | account usage -- a lot of employees at MWC have personal AOL |
| 13 | accounts on their company computers.  You may recall that |
| 14 | Ms. Curto, the plaintiff, was criticized for that.  She was |
| 15 | using an AOL personal account to communicate with her |
| 16 | attorney. |
| 17 | So we looked at whether or not other employees |
| 18 | have AOL accounts, whether they're allowed to do that.  They |
| 19 | are.  Many of them have personal AOL accounts.  Who?  One is |
| 20 | President Jack Hennessy, president of the company, a |
| 21 | defendant in this case.  Another is defendant James Granato. |
| 22 | How do we know that?  Mr. Ligenzowski, head of IT, |
| 23 | told us at page 50.  And we said, do you do anything about |
| 24 | that?  He said no, we do not view that as a violation of |
| 25 | company policy.  Mr. Ligenzowski at page 50 says, having and |

1   using an AOL account is not a violation of company policy.

2          Mr. Granato, most recently, just like two or three

3   days ago, finally responded to our interrogatories, and

4   advised us that yes, he uses an AOL account, and nobody at

5   MWC ever told him not to. In fact, we have a brochure from

6   a convention that Mr. Granato attended this month. He's

7   listed in it, and next to his name is his personal AOL

8   account. That's how people should contact him.

9          The use of the AOL account is important. It's key

10   to the next question, which is, did Ms. Curto, the

11   plaintiff, have a reasonable expectation of confidentiality

12   when she used her personal AOL account to communicate with

13   her attorney? The answer is yes.

14          The testimony of our IT witnesses was that MWC

15   could not access or intercept AOL e-mails, e-mails sent by

16   an employee through their AOL account, because they never go

17   through the MWC server. Mr. Cruz testified that at pages 91

18   to 92. So Ms. Curto was using an account that could not be

19   monitored or intercepted. It was a private account, she had

20   a private password, never went through the MWC server, and

21   there was no monitoring at all. And even if there had been

22   monitoring, which there wasn't, they couldn't monitor that

23   personal account.

24          So her expectation would seem to be well-founded,

25   seemed to be well-founded. What we found out was it really

1  was well-founded. She was right, because at no point during
2  the time she was employed was that account ever monitored.
3  And in fact, even after she was terminated, for a year and a
4  half, it still wasn't monitored. Nobody looked at it.

5  In fact, when she returned the computer, what did
6  they do with it? Did they look at it, examine it, monitor
7  it? No, they gave it to another employee. They gave it to
8  Carmel Banesso (ph) for her use. So she had it. Who knows
9  what she did with it.

10  Then a year and a half later, in May of 2005, Mr.
11  Anelli hired a company called In Focus Litigation, a rather
12  foreboding name for a company. He hired them to review that
13  computer. So what did they have to do. They had to go to
14  Carmel, get it back. Mr. Cruz said, that took quite a
15  while, Mr. Cruz said at pages 122 to 123.

16  But when he finally got it back from Carmel, then
17  he had to transfer all of those files of Carmel's on to
18  another laptop, give that to Carmel. And then take what was
19  Carmel's computer and before that was Ms. Curto's computer,
20  and give it to In Focus Litigation. Justin Cooper is the
21  name of the fellow from In Focus who finally took a look at
22  the computer.

23  He's the guy that ultimately came up with the
24  gibberish which is the subject of this application. We
25  didn't find that out until January 4th, fourteen days ago.

1  We had been given Mr. Cooper's name.  We didn't know how he

2  figured in this.  So of course, we subpoenaed him, noticed

3  his deposition.  We were advised that Mr. Anelli represents

4  him.  By the way, Mr. Anelli apparently represents all

5  nonparty witnesses in this case, and that's very convenient.

6          In any event, we were told that we couldn't have

7  his deposition before the hearing today because they need

8  three weeks to gather the documents that we asked for in our

9  subpoena and notice of deposition.  Luckily, we had obtained

10  a lot of information from other sources.

11          The last thing we looked at, another (ui) factor,

12  is the precautions taken by plaintiff to protect the

13  confidentiality of her communications with counsel, and they

14  were -- she used a private AOL account, with a private

15  password, an account that MWC could not access.  She kept

16  the computer in her home, so that others did not have

17  physical access to it.  She deleted her attorney notes, her

18  communications with counsel, when she was asked to return

19  the computer.

20          THE COURT:  Deletion in quotes.

21          MS. SCHLISSEL:  And in July of 2005, when she was

22  told that these documents had been reconstructed,

23  plaintiff's counsel immediately demanded that they be

24  returned and asserted the privilege.  Bottom line, there

25  hasn't been any waiver here.  As in Asia Global, the mere

1  existence of a policy is not sufficient to eliminate the
2  privilege, and there has not been a waiver.

3          And we ask your Honor to direct the defendants to
4  deliver all reconstructed documents and copies, all copies,
5  hard and electronic, of those privileged documents.  And
6  frankly, this application has delayed this case for months,
7  at an extraordinary cost to plaintiff, and that should not
8  be condoned.  The defendants should pay for it.  They have
9  used the financial disparity in this case, which is obvious,
10  to their strategic advantage.  And we ask that they pay the
11  costs of this application.  Thank you, your Honor.

12          THE COURT:  Mr. McEntee?

13          MR. McENTEE:  Judge, let me start off by
14  addressing the one issue that Ms. Schlissel talked about,
15  where she said -- she talked about the precautions taken by
16  plaintiff, and that the plaintiff used a private AOL account
17  on her computer to transmit these documents.

18          That's not what the plaintiff actually testified
19  to here.  We have submitted, I believe, the transcript of
20  Ms. Curto's deposition, but I'll just read the relevant
21  portions, where she's asked, how did she transmit these
22  documents?  It's on page 84, beginning at line 6.

23          "Question:  In connection with what you're
24  referring to as the attorney's notes that were deleted, were
25  those notes ever transmitted to your counsel?

1           "Answer:  Yes.

2           "Question:  And were those notes -- did you

3   utilize the company's computer in transmitting those notes?

4           "Answer:  Can you repeat the question?

5           "Question:  How did you utilize the company's

6   computer?

7           "Answer:  How did I transmit them?

8           "Question:  Yes.

9           "Answer:  I don't recall.

10          "Question:  How did you utilize the company

11  computer then?

12          "Answer:  I prepared notes in the computer.

13  That's how I utilized it.

14          "Question:  You don't recall how you transmitted

15  those notes?

16          "Answer:  No.

17          "Question:  Do you recall if it was by way of e-

18  mail?

19          "Answer:  I don't recall.

20          So now counsel is making a representation that

21  these things are sent by the AOL account, but there is no

22  document showing that, and the plaintiff's testimony

23  actually directly contradicts that.

24          But let me just go through a few points, if I may,

25  your Honor.  Counsel pointed out a number of things that

1    were testified to by the company personnel, but she left out
2    a few things which I'd like to highlight, if I could.   The
3    two main people who testified, we respectfully suggest, were
4    Carol Swaboda (ph) and Blanche Marchito.

5            Ms. Swaboda, who is an HR manager for Medical
6    World, testified that Medical World had a written computer
7    usage policy.  And I think the plaintiff now concedes that,
8    even though they initially denied that there was a policy.
9    She also denied that she received the policy, but I think
10   now she concedes that she does.

11           She testified as to instances in which Medical
12   World actually enforced the policy.  She testified that the
13   IT staff monitored the computer usage of an employee, Nolan
14   Madden (ph), a production assistant who was using his
15   computer and e-mail address for personal business.  She
16   testified that on two other occasions, the IT department
17   monitored employees' computer usage where employees were
18   suspected of downloading pornography off the internet.

19           I do have a declaration that I'd like to hand up
20   to the Court from Ms. Swaboda that reinforces her testimony.
21   I had hoped -- we had spoken to plaintiff's counsel a while
22   back about arranging for an exchange of materials, but we
23   were unable to reach any agreement on that.  So I'm just
24   handing these materials up.

25           MS. SCHLISSEL:  What is this?  This is a

1  clarification of a deposition?

2       MR. McENTEE:  No.  It's an affidavit, counsel,

3  attaching documents.

4       Judge, I'm also going to hand up to the Court a

5  declaration of Mr. Anelli, in which he simply attaches a

6  number of materials, including the deposition of Lara Curto

7  and some of the other deposition transcripts.  I have copies

8  for counsel.

9       THE COURT:  Other than that which you pointed out

10  I believe of Ms. Curto's deposition, is there anything else?

11       MR. McENTEE:  Yes, I just want to finish, your

12  Honor.  Forgive me.

13       THE COURT:  Okay.  Blanche Marchito was deposed

14  and again, her transcript is being handed up to the Court.

15  She testified that the IT department reviewed employee

16  electronic communications.  And generally, it was done when

17  -- an employee's computer usage would be reviewed if a

18  manager raised a concern.  And she was asked to identify,

19  and she did, occasions when an employee's computer usage was

20  monitored and reviewed.

21       She gave an example of a woman by the name of Ann

22  LeFever, an employee who was suspected of playing poker on

23  the internet using her work computer.  Another woman, Nicole

24  Keller (ph), her computer use was reviewed when a manager

25  suspected she was using her company-issued computer for

1 personal items during business hours. And then an employee
2 in Chicago, his computer was reviewed when it was suspected
3 that he was accessing pornographic web sites.

4 So it is I think inaccurate to say that the
5 company did not monitor the computers of the company's
6 employees when it was warranted. It certainly did not on a
7 daily basis monitor everybody's e-mail, but it did do it
8 when situations did arise.

9 Just a few other matters, your Honor. One of the
10 things that the Court brought up was the four-factor test
11 and the Asia Global Crossing case. I think the Court may be
12 aware that that case, which was decided in March of last
13 year, has never been cited by any court. And as the Court
14 pointed out at the beginning of this argument, there is no
15 case law that says that the question of waiver is contingent
16 upon whether a policy that is actually implemented is
17 enforced or not.

18 That's something that the Court was simply
19 interested in, and I think the record shows that when
20 warranted, the Court did -- I'm sorry, the company did
21 review computer usage by employees. Interestingly, the
22 Global Crossing case really doesn't even discuss the
23 criteria for monitoring. It simply notes it as a factor but
24 then doesn't discuss with respect to the case there what was
25 actually done with respect to monitoring.

1       I also note that the Global Crossing case is
2   distinguishable on several grounds, one of which is, in that
3   situation, the parties disputed about A) whether there was a
4   policy, and B) whether the individuals involved were even
5   aware of it.

6       Here, by contrast, no question there was a policy,
7   and the plaintiff A) testified that she received it, B)
8   produced a copy of the employee manual that she had in her
9   possession, and C) we put into the record acknowledgments of
10  that policy, in which she said she received and understood
11  it.  So if she didn't read it for some reason, that's her
12  own fault.  There's no question that she did receive it.

13      The last time we were here, your Honor, the Court
14  will recall that we had a discussion about whether the
15  plaintiff was finally going to produce a privilege log.  We
16  had made the argument, supported by case law, that by
17  failing to actually produce a privilege log at the time that
18  they produced their documents in response to our document
19  demand, they waived the privilege.

20      The Court seemed inclined to forgive that and
21  allow them to produce a privilege log.  One of the things
22  that we did ask the Court, and the Court granted our
23  request, was that the plaintiffs do two things.  One:
24  Produce any documents that were copied.  And they said they
25  copied everything before they deleted it.  Produce any

1 copies of things that were not subject to a claim of

2 privilege. They didn't produce anything.

3 They're saying either we couldn't figure out what

4 it was or we produced it. But the other thing they didn't

5 do was tell the Court whether the materials that they copied

6 were copied in electronic form, because there's a loss of

7 meta (ph) data that is crucial here.

8 One of the things that we're trying to figure out

9 is who received the document, who sent the document, when it

10 was created, when it was edited, when it was printed.

11 That's all meta data that would be associated with these

12 documents. Now, the Court will recall we sent several

13 letters to the Court, saying we've asked them to produce or

14 tell us whether the copies that they said they kept were in

15 electronic form, stonewalled us. We don't know what it is.

16 We're assuming that the Court received paper

17 documents, but they have not produced to the Court, and

18 certainly not to us, the electronic forms which will have

19 that meta data. Some of these things are particularly

20 crucial, with the sequence of events.

21 There are essentially three categories of

22 documents that are at issue here, and I think that -- let me

23 see if I can try and summarize it, your Honor. There are

24 really three documents and sometimes there are multiple

25 copies.

1    The first one is portions of a memorandum from
2    plaintiff to defendant Hennessy, the company's chief
3    executive officer. The second is a chronology of events,
4    describing many of plaintiff's underlying claims. And the
5    third are portions of drafts of plaintiff's affidavit to the
6    EEOC.

7    If you just step back to the Hennessy memo --
8        THE COURT: I don't know why that's an issue.
9        MR. McENTEE: Well, because the Hennessy memo --
10   they're claiming that it's a privileged document. They're
11   saying that it's privileged. We don't believe it's
12   privileged at all. They're saying the drafts of it are
13   somehow privileged.

14   But if you look at the timing of it, it
15   particularly shows that it's not attorney work product, it's
16   not made in contemplation of litigation. According to
17   plaintiff's privilege log, the document was created in April
18   of 2003. We think it may have been created earlier. But
19   again, we don't have the meta data, which shows the first
20   date it was.

21   It was created in April of 2003. She wasn't
22   placed on probation until June of 2003, and she did not file
23   her internal complaint of sexual harassment involving this
24   other employee until June 26th, 2003. And it was in
25   September of 2003 that she finally filed her EEOC claim. So

1  certainly, even before she was placed on probation, there

2  was no adverse action towards the plaintiff.  Why is she

3  creating this thing?

4  She's saying now, I was creating it because I was

5  about to start a lawsuit.  Well, the sequence of events

6  doesn't establish that.  What they're trying to do is put a

7  cloak around things, which simply is a contemporaneous

8  recording of events that she made, and the case law says

9  that the mere contemporaneous recording of events by a

10  plaintiff is not something that is privileged.  I've cited

11  the Rexford Olzack (ph) case at 176 FRD 90.  I believe I

12  cited it previously to the Court.

13  But we're in a situation here where they failed to

14  produce documents.  They failed to produce the meta data

15  that will tell us the crucial information about the

16  documents.  And in fact, the underpinnings of what they're

17  saying they did with these documents are not borne out by

18  the facts.  The transmittal of these documents were not done

19  by an AOL account.  Well, certainly there's no proof of

20  that.

21  And what are the other documents?  These are

22  Microsoft Word documents that were created on her computer.

23  If you look at all the cases that we cited, including Judge

24  Posner's (ph) case, they say that if the company has a

25  policy warning the person, this is a company property; if

1   you use it, you use it at your peril; it belongs to the

2   company -- they have not overcome that.

3          And they have both the burden to establish that

4   these materials are privileged and to show that there hasn't

5   been a waiver.  And they haven't done either.  So these

6   depositions which we submitted -- which we went forward with

7   don't help the plaintiff's case at all.  These were

8   documents that should have been produced.  They weren't, and

9   we believe that the Court should order their use in this

10  proceeding.  Thank you, your Honor.

11          MS. SCHLISSEL:  May I, your Honor?

12          THE COURT:  Uh-huh.

13          MS. SCHLISSEL:  Very briefly.  With regard to

14  whether or not we have electronic copies of all of those

15  documents, we do.  There has been no stonewalling.  As a

16  matter of fact, in a letter to your Honor dated November 4,

17  2005, we reported the fact that we in fact do have

18  electronic copies of those documents, of those privileged

19  documents.

20          THE COURT:  I also believe -- I thought there was

21  a letter sent to the Court and to counsel, which reflected

22  that those were -- that was identified to the defendant.

23  Mr. Curto sent a letter sometime in December, I believe,

24  which reflected that those documents were --

25          The complaint in your letters, Mr. McEntee, if I

1    recall -- and I didn't bring those letters out, I don't
2    think -- was that they did not identify which documents they
3    had electronic copies of, or in whatever form they were, but
4    electronic and hard copy.  And you were complaining about
5    that, as to whether they had identified whether they had
6    electronic.

7              I believe Mr. Curto did respond eventually.  I'm
8    not going to say he did it in a timely manner, but it was
9    rather late, because the letters were flying back and forth,
10   I believe at that time, almost at like a rate of one a day
11   at least, between counsel.  And I believe finally, there was
12   a response from Mr. Curto identifying the claims, that he
13   had sent that to you.

14             MR. McENTEE:  Judge --

15             THE COURT:  Which is why the Court never did
16   anything with that application, because I thought it was
17   moot.

18             MR. McENTEE:  Judge, it was our interpretation of
19   the letter that they did not answer that question.  If
20   they're making a representation on the record today that
21   that's the case, then so be it.

22             THE COURT:  I thought Mr. Curto had done that.

23             MR. McENTEE:  Can I see it?

24             MR. CURTO:  Your Honor, their letter to your Honor
25   complaining of this issue is dated November 2nd, 2005, and my

1    response is dated November 4th, 2005.  It specifically

2    states, "All documents over which plaintiff claims a

3    privilege have been maintained in their electronic format,

4    as well as in hard copy format, with the sole exception of

5    item 16 on the privilege log."  This document is a portion

6    of an e-mail between plaintiff and her counsel, and we don't

7    have any copy of that and we were not hiding that fact.

8            MR. McENTEE:  Judge, again, the privilege log that

9    was submitted to the Court along with the documents does not

10   indicate that the meta data --

11           THE COURT:  Your complaint was whether those

12   documents were in electronic form.  I don't know whether

13   your letter was specific enough to reflect the question as

14   to whether or not the electronic forms that they had

15   reflected the meta data or not.  In other words, in what

16   format did they have the electronic forms, and you know that

17   there were two.

18           MR. McENTEE:  Right.  And in what format did they

19   produce it to the Court?  That's the question I don't know

20   the answer to.

21           THE COURT:  I don't believe that was asked.

22           MR. McENTEE:  Pardon?

23           THE COURT:  I don't believe that that was asked by

24   you, as to whether it reflected the meta data -- whether the

25   copies of the electronic they had reflected the meta data or

1    not.

2         MR. McENTEE:    Respectfully, your Honor, we didn't
3    see it because it was brought in camera.    It's just unclear
4    to me whether the Court has received not only the documents
5    but the meta data associated with the documents, for
6    example, that would show the data was created -- anything of
7    that nature.

8         THE COURT:    To be honest with you, at this
9    particular point, I wasn't very frankly too excited about
10   whether I should have meta data or not have meta data with
11   regard to it, because the only time that issue has come up
12   as to the timing of these documents is today.

13        MR. McENTEE:    As I think I pointed out to the
14   Court, one of the things the meta data should show is who
15   created it, who it was sent to, who copied it, when it was
16   created.    Those are all things that would be relevant to the
17   claim of privilege here.

18        THE COURT:    Well, are we talking about the normal
19   caption of an e-mail or what?

20        MR. McENTEE:    Judge --

21        THE COURT:    I understand.    I know what meta data
22   is, but I don't see, in that which was sent to me, nor do I
23   believe that that was an issue with what was sent to me, as
24   to whether or not it included the meta data.    I was not too
25   interested in whether it did include meta data or not, and

1    nobody had raised the issue with regard to meta data.  The
2    request I believe in the letter writing was with regard to
3    whether or not it was in electronic form or not.

4              The reason we wanted electronic form is to get the
5    meta data.  And the Court on the record noted --

6              THE COURT:  You can have two electronic forms, you
7    see, Mr. McEntee, some of which will reflect meta data and
8    some which will not, depending upon how it's kept or how
9    it's retained.

10              MR. McENTEE:  Judge, with the Microsoft Word
11   documents, for example, that are created, where there are
12   multiple drafts, that is going to have the properties of the
13   document, the so-called meta data.

14              THE COURT:  Yes, though it depends -- you see,
15   that's the problem.  You can have on the screen everything
16   but meta data, right?  Isn't that a format, a form that it
17   comes up in?

18              MR. McENTEE:  Judge, you would have to --

19              THE COURT:  And you can print the screens, and
20   it's in electronic form.  It doesn't contain the meta data.

21              MR. McENTEE:  Judge, the document -- you would
22   have to go into the file menu and get the properties of the
23   document, and that would then --

24              THE COURT:  I agree.  That's not what was
25   requested.  The simple request was, was it in electronic

1   form or just simply the hard copy?  The electronic form, to
2   me, and maybe it's because I lack wisdom or lack education
3   in computer technology with respect to these matters, but I
4   look at it as two separate matters:

5           One where it's printed with meta data, and I've
6   got the term for that, when that is requested in the format,
7   in the articles that I read, versus that which you can print
8   off a screen, which is, as far as I'm concerned, still in
9   electronic form as to what I can get up on the screen
10  without going to the properties menu, for example, of the
11  document.

12          MS. SCHLISSEL:  Your Honor, the issue here today,
13  as I understand it, is whether these documents are
14  privileged.  I think we're putting the cart before the
15  horse.

16          THE COURT:  The problem is, on one aspect, we're
17  arguing privilege.  The other is whether or not there was a
18  waiver.  So what Mr. McEntee has chosen to do is claim
19  certain documents are not privileged.  And therefore, we
20  don't have to talk about waiver with regard to those
21  documents.

22          MS. SCHLISSEL:  So let's get back to the issue of
23  privilege.  He says, well, April, 2003 -- that's the date of
24  the draft of the memo to Mr. Hennessy -- that's too early to
25  be privileged.  Well, it's not too early for a few reasons.

1    Number one, counsel assisted in the preparation of that
2    document, because it was clear at that time that a dispute
3    was brewing.

4            As a matter of fact, a document produced by the
5    defendants, an e-mail dated April 3, 2003 from Mr. King,
6    talked about the fact that this was prospective litigation.
7    And that was his word, litigation.  Everybody was thinking
8    in April of 2003 that this was going to end up in
9    litigation.  They were all right; it did.  So to say that it
10   was too early in April to have a privileged document is
11   nonsense.

12           Mr. McEntee also mentioned the fact that --
13           THE COURT:  That still doesn't answer the question
14   about meta data, if the document was created prior or
15   whatever.  It may be that the drafts are after, depending
16   upon when -- let's suppose it was done right after Perkins
17   did what he did, and she put the memo together for Hennessy
18   or for Granato or whoever.  This is just another update.

19           This memo of April, 2003 is simply another update
20   of what she was dealing with when Perkins was on that sales
21   trip, when they were all together on that sales trip, at the
22   bar.  As a matter of fact, there were memos that were sent
23   by her, weren't there, with discussions that she had with
24   people at Medical World with regard to Perkins's behavior?
25           MS. SCHLISSEL:  Yes, there were.

1          THE COURT:  She had with her immediate supervisor,
2   if I recall.
3          MS. SCHLISSEL:  She reported that to the
4   supervisor; that's right.
5          THE COURT:  Right.
6          MS. SCHLISSEL:  On more than one occasion.
7          THE COURT:  Right after it happened, right?  Then
8   there were discussions at the ensuing breakfast, if I
9   recall.
10         MS. SCHLISSEL:  That is also correct.
11         THE COURT:  Right.  So the meta data may or may
12  not play a part in that.  At the moment, I've got to get
13  past the issue of whether or not there was inadvertent
14  disclosure.  It depends on which order people want to take
15  it in.  I've chosen to take it in the order as to whether it
16  was inadvertent disclosure.  Whether the material is
17  actually privileged or not is another issue.
18         MS. SCHLISSEL:  Mr. McEntee also, if I may, your
19  Honor, mentions that there was a fellow who was viewing
20  pornography on his company computer.
21         THE COURT:  Right.
22         MS. SCHLISSEL:  And they did something about that.
23  The head of HR testified that when something like that
24  happened, if somebody saw something like that and the
25  manager requested that IT take a look, they did.  She talked

1  about three things. There was the guy looking at

2  pornography in California.

3          THE COURT: That was in San Francisco, if I

4  recall, right?

5          MS. SCHLISSEL: In California, San Francisco;

6  that's right. That doesn't count.

7          THE COURT: Isn't San Francisco California?

8          MS. SCHLISSEL: Then there was the woman -- Mr.

9  McEntee didn't mention this one -- who was playing poker all

10  day long.

11          THE COURT: He did.

12          MS. SCHLISSEL: Did he? Okay. Her manager

13  complained, too.

14          THE COURT: Was that Keller or LeFever?

15          MR. McENTEE: LeFever.

16          MS. SCHLISSEL: I'd complain about that.

17          THE COURT: LeFever. I heard poker.

18          MS. SCHLISSEL: You can't play poker all day long

19  when you're supposed to be working.

20          THE COURT: Was this (ui) or what?

21          MS. SCHLISSEL: They did something about that.

22  Then there was a guy that was actually running a business

23  during the day from his computer, wedding invitations and

24  wedding photographs.

25          THE COURT: I thought that was his own wedding. I

1   got the impression that that was his own wedding.

2          MS. SCHLISSEL:  No, it was a business, so they

3   looked into that as well.

4          THE COURT:  It was a business.

5          MS. SCHLISSEL:  All of that is really a far cry

6   from monitoring, as we know, e-mails in order to ensure

7   compliance with a policy.

8          THE COURT:  One was Chicago and one was San

9   Francisco, right?

10         MR. McENTEE:  Yes.

11         THE COURT:  Where did she work?

12         MS. SCHLISSEL:  She worked in New York.  She

13  worked on Long Island.

14         THE COURT:  In New York.

15         MS. SCHLISSEL:  Mr. Curto makes a good point.

16  Over a hundred employees for what, ten years -- and we've

17  got four examples of improper computer usage they did

18  something about.

19         THE COURT:  Did we have computers for ten years?

20         MS. SCHLISSEL:  Anything further, your Honor?  Any

21  questions?

22         THE COURT:  No.

23         MR. McENTEE:  I'm not going to belabor it, your

24  Honor; nothing further.

25         THE COURT:  Okay.  Before I go further, I do want

1   to note something about this matter.  Well, this issue has
2   taken up some time in this case.  It's a rather important
3   issue, not only to this case but for other cases.  But I do
4   want to point out something else, and that is that I have
5   other cases where I've had to deal with issues of
6   inadvertent disclosure.

7          I want you to know that in this particular case,
8   counsel in this case have been absolutely above board with
9   regard to recognition of the ethical standards of the
10  American Bar Association with regard to issues of receipt of
11  privileged material, where possibly at times they should not
12  have received it.  And that is the question of revealing the
13  fact that they have received inadvertent disclosure of
14  material which may be privileged or protected from
15  discovery.

16         In this case, I want to say that counsel has acted
17  extremely professionally, and I am very proud of that in
18  this case.  I just want all counsel to understand that.  The
19  Regas (ph) case, where counsel did act also professionally
20  in the case, United States v. Regas, 281 F.Supp. 733 at 738,
21  a Southern District case, where counsel received from,
22  believe it or not, the United States attorney's office, a
23  matter which counsel should not have been there, was the
24  work product notes of the paralegal or the investigator or
25  whoever somehow or other got on to the wrong drive or the

1    wrong file and sent it on to the defendant's attorney.

2         You would think that the defense attorney would

3    use that material, but instead called the U.S. attorney and

4    said, I have this stuff.  That of course weighted the court

5    decision to advise them there would be no issue later with

6    the client as to whether or not he acted properly from the

7    standpoint of the defendant in the case.

8         But there is also an example of the way to handle

9    things professionally, and that was done here.  From the

10   standpoint of the Court, the Court is proud of that fact and

11   takes pride in that type of conduct, so that we can deal

12   with the main issue, and that is the inadvertent disclosure.

13        Having said that, I'm going to direct the

14   defendant, because my analysis of the factors -- while I

15   recognize the federal courts have differed in their

16   interpretation of inadvertent disclosure, but I do want to

17   talk about some of the blowout with regard to that.

18        That is that generally, when there is a

19   voluntarily disclosure of communications protected by

20   attorney/client privilege, it generally results in a waiver

21   of that claim of privilege as to those documents.  See In

22   Re: Steinhardt (ph) Partners Limited Partnership, 9 F.3d 230

23   at 235, Second Circuit (1993); United States v. Gangi (ph),

24   1 F.Supp.2d, 256, 263, Southern District of New York (1998).

25        Even privileged documents are not protected if a

1   party voluntarily discloses them.  However, the "inadvertent
2   production of a privileged document does not waive the
3   privilege unless the producing party's conduct was so
4   careless as to suggest that it was not concerned with the
5   production of the asserted privilege."  Securities and
6   Exchange Commission versus Casano (ph), 189 FRD 83 at page
7   85, Southern District of New York (1999).  The quotation
8   marks in that case and the citations omitted.  Gangi stands
9   for the same proposition.

10      That approach fosters the open communication
11  between counsel and the client, and yet creates an incentive
12  for counsel to engage in production carefully, since failure
13  to take reasonable precautions will result in waiver.  Local
14  851 of the International Brotherhood of Teamsters versus
15  Cune and Negal (ph) Air Freight, Incorporated, 36 F.Supp.2d
16  127, 130, Eastern District of New York (1999).

17      Although the federal courts have differed as to
18  the legal consequences of a party's inadvertent disclosure
19  of privileged information, the general consensus in this
20  District is that the disclosing party may demonstrate, in
21  appropriate circumstances, that such production does not
22  constitute a waiver of the privilege or work product
23  immunity, and that it is entitled to the return of the
24  mistakenly produced documents.  Lava Trading, Incorporated
25  versus Hartford Fire Insurance Company, 2005 West Law 66892

1   at *2, Southern District of New York, January 11, 2005.

2       Under this flexible approach, the courts are

3   called upon to balance four relevant factors:  One, the

4   reasonableness of the precautions taken by the producing

5   party to prevent inadvertent disclosure of privileged

6   documents; the volume of discovery versus the extent of the

7   specific disclosure issue; the length of time taken by the

8   producing party to rectify the disclosure; and four, the

9   overarching issue of fairness.  United States v. Regas, 281

10  F.Supp.2d 733, Southern District of New York (2003).

11      In this Court's analysis of the factors, this

12  Court adds but one, and it may be a subset, and that is the

13  factor or subfactor this Court advised counsel of the last

14  time you appeared before me.  That is whether or not, if

15  there was a policy which placed a person on notice with

16  regard to the use of computers or electronic material,

17  whether or not there was enforcement of that policy.

18      In this particular case, there is no question, and

19  it is now undeniable that the employee manual or the

20  computer usage manual with regard to page 43, and which was

21  signed by the plaintiff in recognition of the policy that

22  computers were not to be used for personal use, and there is

23  no question that it was signed by the plaintiff, and that

24  the plaintiff did use the computer for personal use.

25      But that does not end the issue, unlike the

1   Seventh Circuit case, where the policy was sufficient.  This
2   Court goes beyond that, so that it can take a look at
3   whether or not there was an enforcement which would lull a
4   person who uses those computers or laptops into a false
5   sense of security.

6           This Court finds that in this particular instance,
7   that in analyzing that factor, this Court finds that there
8   is a lulling of a false sense of security, in view of what
9   has occurred here.  The testimony during the depositions and
10  declarations that counsel has brought to my attention during
11  the very fine oral presentations today indicate that there
12  are approximately four circumstances in which the defendant
13  monitored computer use of its employees with regard to
14  personal use, and that occurred simply when there was a
15  request by either a manager or supervisor or by someone else
16  at the defendant corporation.

17          For example, there were the four instances, one of
18  which involved that which we hear too much about today, and
19  that is the use of downloading alleged pornographic
20  materials.  One was with regard to alleged playing of poker
21  on the net, and a third was with regard to the conduct of an
22  outside business, even though not a competing business, but
23  certainly a business which was over and above the purposes
24  of the hirings.  The person was using the company computer
25  for moonlighting purposes, it appears, as three of the four

1   examples.

2       Moreover, one of those examples occurred in San
3   Francisco and I believe one occurred in Chicago, or at least
4   one was in California and one was in Chicago, certainly not
5   something which might make the rounds of even the rumor mill
6   in New York, where the plaintiff worked, with regard to
7   that.

8       With regard to further the factor of the steps,
9   there was with regard to the steps the reasonableness of the
10  precautions taken by Ms. Curto in this particular case.   It
11  is also clear that Ms. Curto did take certain steps to
12  prevent the inadvertent disclosure of the information, and
13  that was that there was an attempt to delete the material
14  before turning in the computer or turning in the laptop.

15      Unfortunately, the plaintiff did not realize that
16  unless you destroy a hard drive, nothing is ever deleted,
17  unless it is written over on the hard drive.   In certain
18  instances, it is clear from what counsel have indicated to
19  the Court that in certain areas, there was some material
20  which was written over in those sectors of the hard drive or
21  areas of the hard drive.   But in other areas, other
22  materials popped up, and that is what Mr. McEntee
23  professionally advised the plaintiff about.

24      But in any event, the laptop which is at issue in
25  this particular case, or the subject laptop, was not brought

1    to the office, according to plaintiff.  It was kept at her

2    home.  The use of that laptop contained a private AOL

3    account with the usual password technique of the AOL

4    account.

5         It is clear from the deposition testimony that

6    many others or some others at the defendant corporation,

7    including the president, who is a defendant in this case,

8    Jack Hennessy, and Mr. Granato, and I believe possibly even

9    the head of human resources -- I'm not quite sure about that

10   one -- had personal accounts or private AOL accounts on

11   their computers.  Certainly Mr. Hennessy did and Mr. Granato

12   did, based upon the statements of counsel.

13        So they also appeared to be in violation of the

14   computer usage policy, unless somebody can show me that page

15   43 did not apply to them, or that setting an example by the

16   president and other employees of the company was not -- it

17   was do as I say but not do as I do.  I don't know what the

18   policy was.  But in any event, it is clear that others at

19   the company did use the computer system or the laptops.

20        Second of all, counsel has indicated, and this has

21   not been rebutted by the defendants, that any e-mails that

22   were sent through the AOL account of Ms. Curto, the

23   plaintiff in this matter, did not go through the defendant's

24   servers and would not go through the defendant's servers,

25   would go directly through I guess the AOL servers or routes,

1    whichever AOL used throughout the AOL system.  So with
2    regard to that, this Court finds that that factor really
3    balances overwhelmingly in favor of the plaintiff.

4         With regard to the volume of material, it is not
5    clear how much volume -- there was or wasn't that much
6    volume.  But we must look at the fact that we are talking
7    about electronic -- that which is taken off a laptop and not
8    something which is produced from corporate file cabinets and
9    other materials of that nature, where we're talking about a
10   tremendous volume of paperwork.

11        The length of time taken by the plaintiff to
12   rectify the disclosure or at least ask for the documents
13   back was rather immediate, upon notification.  Both sides
14   acted absolutely properly with regard to the positions they
15   took.  As indicated by this Court earlier, the defendants
16   acted absolutely professionally, notifying the plaintiff
17   that they had this material and basically have held it
18   pending the order of the Court, as in Regas.

19        And finally, with regard to the overarching issue
20   of fairness.  This Court holds dear the fact that there are
21   communications made between a lawyer and client for the
22   purpose of obtaining or providing legal advice for services.
23   Too often, that privilege which is created in that
24   atmosphere, and which we encouraged for many, many years --
25   too often in the last few years, we have violated that

1   privilege, and the courts have by court order, have taken
2   away that privilege, sometimes for good reasons, sometimes
3   for not such good reasons, but it has been done.

4            And it appears that we really should be
5   reestablishing those the inviolability of the
6   attorney/client privilege and to reexamine what we have done
7   with regard to work product protection.  Clients rely upon
8   the advice and the services of counsel.  To continually
9   invade that privilege, which we encourage so that clients
10  can give full disclosure to their attorneys, it does not do
11  the profession or the law much good when we attack it.

12           In the last year or so, the Second Circuit, in a
13  case which was written by Judge Walker, which I don't have
14  before me at the moment, he went back, when he upheld the
15  privilege asserted by counsel in a government counsel case,
16  which dealt with the investigation of the former governor of
17  the State of Connecticut and the presentation of material or
18  the subpoenas that were issued to counsel for the former
19  governor.

20           And it was advice given by that counsel in Mr.
21  Roland's personal capacity.  Some of you may remember the
22  charges that came about, to which he eventually pleaded
23  guilty.  But that was a case that appeared before the Second
24  Circuit.  And Judge Walker, in a ringing decision, upheld
25  the attorney/client privilege in that matter.  And I'm

1   hoping that that is a sign of things that are returning the
2   attorney/client privilege back to its former mantle in the
3   law.

4           So based upon -- so from the standpoint of
5   fairness, it is this Court's view that a return of both --
6   in whatever format the defendant has material to which a
7   claim of privilege has been made at this particular time
8   shall be returned to the plaintiff.

9           That plaintiff is now directed, upon return of
10  that material, to review that which it has with regard to
11  whether or not meta data exists with regard to any of those
12  documents and to reveal all meta data to the defendant with
13  regard to those document, so that a determination can be
14  made as to whether or not the work product protection may or
15  may not apply.

16          Of course, the leading case on whether something
17  is entitled to work product protection is United States
18  against Adlman in the Second Circuit, A-d-l-m-a-n, I
19  believe, which I'm sure all of you who are sitting here are
20  probably very familiar with in some fashion, since the case
21  gets cited more often for that proposition.

22          That constitutes the decision of this Court with
23  regard to these documents.  This Court also, however, denies
24  any application for costs, as there was substantial
25  justification for the application and cross-application

 1    herein.  And despite the argument of the plaintiff with

 2    regard to that, while it may have cost us time in this case,

 3    the issue and its relevance to the issues in this case was

 4    substantial.  So we will proceed from there.

 5              MR. CURTO:  Your Honor, just for clarification,

 6    the issue about whether work product privilege applies is

 7    still open.  It will be reviewed --

 8              THE COURT:  It's not a privilege.  Work product is

 9    not a privilege.

10              MR. CURTO:  Work product protection.

11              THE COURT:  I also warn folks about whether or not

12    -- there are two elements of work product which you are

13    going to have to deal with, and you might as well know about

14    it now.  Simple work product, if it's been -- if it cannot

15    be recreated or if it involves facts which there's a

16    substantial need to know, then there is no protection.

17              If it is core work product and the work product

18    reflects mental thought processes of counsel, then it may --

19    it has a higher -- the defendant has a higher standard to

20    overcome with regard to that, because it's extremely,

21    extremely rare to obtain core work product as against any

22    showing of substantial need under 26(b)(3), I believe, and

23    the case law which is relevant.

24              So from that standpoint -- and I'm not so sure

25    that the parties should spend much time arguing over the

1    documents of drafts to Hennessy or not Hennessy. I really.

2    don't see where we're going to go with that. I really don't

3    see how it applies, quite frankly, because it was either

4    sent in some form or it wasn't.

5         So we will take it from there. So review your

6    privilege log. You need to turn over electronic documents

7    with meta data, if meta data exists. I don't know if it

8    does or not. Whether you have the meta data on that, that

9    should be returned to the plaintiff on those documents,

10   because you're the ones, remember, who wound up with the

11   computer.

12        MR. McENTEE: Just for clarification, though --

13        THE COURT: And I'm assuming you sent it out to

14   somebody to review.

15        MR. McENTEE: Typically, a document would have

16   meta data associated with it. It doesn't exist in that form

17   anymore because it was deleted. It's just now in fragments.

18   The fragments associated --

19        THE COURT: Sometimes it's there, sometimes it's

20   not, Mr. McEntee. I can't answer that. You folks -- she

21   returned the computer to the defendant, which was supposed

22   to be the thing to do, right? And it was done. I'm

23   assuming you folks sent it out or somebody found these

24   documents on the hard drive, in whatever form they remained

25   in, even after the attempted deletion. Either they still

```
 1   have the meta data and you did look for it or not.  I don't

 2   know.

 3              MR. McENTEE:  Judge, we will speak with our

 4   technical people and make sure that any data of any kind

 5   associated with the things on the privilege log that are

 6   claimed to be privileged we'll return.  We'll do it that

 7   way.

 8              THE COURT:  Okay.

 9              MS. SCHLISSEL:  Both hard copy and electronic copy

10   are coming back; is that correct?

11              THE COURT:  Yeah.

12              MR. McENTEE:  Understood.

13              MS. SCHLISSEL:  Okay.

14              THE COURT:  Hard, digital, any other form.  I

15   don't know, is there something other than hard or digital?

16   Does anybody want their depositions back?

17              MS. SCHLISSEL:  No, thank you, your Honor.

18              THE COURT:  Where are we going to go from here?

19              MR. McENTEE:  Could we just have it in the court

20   file for any reason?

21              THE COURT:  No, I mean is there anything here

22   that's confidential or anything?

23              MR. McENTEE:  There may be, yes, Judge.

24              THE COURT:  Alright, then --

25              MR. McENTEE:  Like Mr. Anelli's declaration.
```

```
 1           THE COURT:  At the moment, the only declaration --
 2           MR. McENTEE:  Exhibit A.
 3           THE COURT:  Alright.  I'm looking at --
 4           MR. McENTEE:  Your Honor's courtroom deputy has it
 5   right there, Judge.
 6           THE COURT:  Oh, okay.  I'm looking around for it.
 7   The only reason why I ask is first of all, obviously, all
 8   sides have their rights under Rule 72 with regard to the
 9   issue.  And if there is, then I need to retain that which I
10   will need for Judge Hurley, to send on to Judge Hurley.
11           If that's not going to happen, then I can return
12   all this to you and you can remark them, to make sure that
13   anything that should have been marked confidential will be
14   marked confidential.
15           MR. McENTEE:  Fine, Judge.
16           THE COURT:  So it's identified as what was handed
17   up to me, that some were handed up to me by Ms. Schlissel
18   and by Mr. Curto.  You handed up I believe Carol Swaboda's
19   declaration; is that correct?
20           MR. McENTEE:  And Mr. Anelli's.
21           THE COURT:  You can add that on to that.  I
22   believe you folks gave me the -- I thought I had four.
23   There it is, four deposition transcripts.
24           MR. McENTEE:  Just one other point of
25   clarification, and I don't want to put words in the Court's
```

1    mouth.  I'm just trying to understand.  Has the Court

2    determined that these materials are not subject to

3    attorney/client privilege but they may be entitled to --

4               THE COURT:  No, I did not.

5               MR. McENTEE:  Okay.

6               THE COURT:  What I'm saying is I'm only opening up

7    an issue with regard to work product, only because of the

8    meta data.  I don't think meta data plays any role in

9    whether something is attorney/client privilege or not, in

10   the content of the communication.

11              So it is unimportant to me whether it was done in

12   the year 1950 or whether it was done in 2003 or whether it

13   was done in 2006, as far as attorney/client privilege is

14   concerned.  Attorney/client privilege doesn't change because

15   of the year or the event.  Work product does, because work

16   product still carries with it somewhat, after Adlman, in

17   anticipation of litigation.

18              MR. McENTEE:  Judge, I'm not going to argue it at

19   all.  I would respectfully point out that the documents

20   oftentimes will show to whom the document was sent.  So if

21   it was sent to everyone at Shea Stadium, for example, it

22   would not be --

23              THE COURT:  I'd have a problem on inadvertent

24   production then.

25              MR. McENTEE:  Right.  Putting aside that for a

1   moment, in terms of logistics here, we're going to endeavor

2   and we will turn over material as the Court told us to do

3   so.  They're going to produce to us this meta data, and then

4   at some point we have to analyze that and then I guess make

5   another submission to the Court based upon that.

6            THE COURT:  That's correct, except I do want to

7   point out that since you are the last ones to have the

8   electronic hardware, which hard drive would or would not

9   reflect meta data of the documents which still existed or

10  existed in part --

11           MR. McENTEE:  Judge, the meta data, to the extent

12  that it existed when they had it, before they deleted it,

13  that's totally corrupted when it's deleted.  So they have

14  meta data that's not corrupted and they're going to give

15  that to us.

16           THE COURT:  You both may have meta data.  I don't

17  know what they produce when they delete it, okay?  That is

18  something the two of you have to talk about.  Did they

19  produce meta data before they deleted it?  That's never been

20  talked about.  Would you agree with that?

21           MR. McENTEE:  No, Judge.  They said they

22  maintained electronic copies of the documents.  Those

23  electronic documents, like the Word documents, the e-mails,

24  that's going to have necessarily meta data.  You're saying

25  that they have to produce that meta data to us and then we

```
 1   take a look at it.

 2              THE COURT:  Correct.

 3              MR. McENTEE:  That's fine.

 4              THE COURT:  Correct.

 5              MR. McENTEE:  Okay.

 6              THE COURT:  But at the same time, any meta data

 7   you may have also shall be produced, if you have it.

 8              MR. McENTEE:  Absolutely, any electronic data.

 9              MR. CURTO:  Judge, again, just to clarify, we are

10   not being directed today to produce meta data for documents

11   over which the attorney/client privilege has been asserted;

12   correct?

13              THE COURT:  If you are claiming -- and I haven't

14   looked at the log.  If you are claiming attorney/client

15   privilege on documents which went outside of the whatever

16   you want to call it, control group or whatever, or which

17   were addressed outside -- in other words, cc's to whoever.

18              The other -- and I'm going to raise it now, Mr.

19   Curto, because if some of these things were sent to you, a

20   relative, were you acting as an attorney or were you acting

21   as a relative?  That's an issue.  So meta data may be

22   critical with regard to that, okay?  The fact that you are

23   an attorney but you are also a relative of the plaintiff

24   doesn't necessarily mean that that which you received, you

25   received for the purposes of obtaining legal advice.
```

1          MR. CURTO:  I understand your point, Judge.

2          THE COURT:  You've got to recognize that.  That's

3  a tricky issue.  So it's just as well that I bring that up

4  now.  What I've said with regard to work product, the meta

5  data is critical because of the dates with regard to when

6  someone might reasonably anticipate litigation.  This is not

7  something prepared by the accountant to give a reading as to

8  what a tax consequence might be and whether or not you're

9  going to get sued by the IRS if you do certain things, as

10  occurred in Adlman.  It's a little bit different.

11         Second of all, I also received a current in the

12  law after Adlman that with regard to insurance company

13  claims, courts have retained the old saw with regard to work

14  product protection or immunity, particularly when the issue

15  becomes arson or something of that nature.

16         Even though everybody anticipates there's going to

17  be litigation, the courts still have sort of maintained that

18  the original insurance company investigation, before they

19  turned it over to another branch of the company, they don't

20  protect that.  Even though under Adlman, it probably should

21  be, the courts are the courts.  They're not consistent.

22         Now the question is other than that, when are we

23  going to get back together again and when are the parties

24  going to talk settlement?  My favorite topic.

25         MR. McENTEE:  When they want to do something.

1 THE COURT: What?

2 MR. McENTEE: When they decide they want to do

3 something.

4 MS. SCHLISSEL: It takes two.

5 THE COURT: The time has come. The time has come.

6 MR. McENTEE: Judge, we submitted an offer of

7 judgment. We've made a number of entreaties in the past.

8 THE COURT: You made a Rule 68 offer?

9 MR. McENTEE: Yes.

10 THE COURT: When? I mean, I'm trying to remember

11 these things.

12 MR. McENTEE: A few months ago. And it was

13 rejected with one sentence saying, no thanks.

14 MS. SCHLISSEL: $195,000, your Honor. It didn't

15 take us too long.

16 THE COURT: What's you client doing now?

17 MS. SCHLISSEL: Working.

18 MR. McENTEE: Your Honor, if the Court wants to

19 direct a settlement conference, we're perfectly glad to

20 participate.

21 THE COURT: I'd like to hear what the demand is,

22 because money is not going to just drop out of the heavens,

23 other than the $195,000, which you rejected. They're not

24 going to bid against themselves. I start my settlement

25 conferences with, I want a demand from the plaintiff, from

 1    the one seeking money.  Sometimes it's the defendant.  In

 2    this case, it is the plaintiff.  You don't have to tell me

 3    today, but I'm telling you now, the time has come.

 4    Settlement doesn't mean surrender.

 5              How about you folks coming back March 15th at 2:00?

 6    The Ides of March may be good for this case.  I certainly

 7    don't want to interfere with Saint Patrick's Day.

 8              UNIDENTIFIED SPEAKER:  Your Honor, I have a

 9    conflict on that day.

10              THE COURT:  How about March 14th at 2:00?

11              UNIDENTIFIED SPEAKER:  That may work.  I know I

12    have something on the 15th scheduled.  The 14th, I don't know.

13              MS. SCHLISSEL:  2:00, your Honor?

14              THE COURT:  2:00.  I'm not kidding about giving

15    them a demand, and a demand that will evoke a response.

16    When I talk about demand, so that it not be a surrender

17    demand.

18              MS. SCHLISSEL:  Understood, your Honor, and we'd

19    like nothing better than to settle this case.

20              THE COURT:  If the defendant files under Rule 72,

21    I'm going to need back all that stuff, after you've marked

22    it confidential, because we've got to send them on up.

23              MR. CURTO:  Thank you, Judge.

24              MS. SCHLISSEL:  Thank you, your Honor.

25              * * * * * * * * * * * * * *

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      I certify that the foregoing is a correct transcript

19  from the electronic sound recording of the proceedings in

20  the above-entitled matter.

21

22

23

24

25  ELIZABETH BARRON                    January 31, 2006